UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| | : | |
| RAND-WHITNEY CONTAINERBOARD | : | |
| LIMITED PARTNERSHIP, | : | |
| PLAINTIFF | : | |
| | : | |
| V. | : | CIV. NO. 3:96CV413 (HBF) |
| | : | |
| TOWN OF MONTVILLE and TOWN OF | : | |
| MONTVILLE WATER POLLUTION | : | |
| CONTROL AUTHORITY | : | |
| DEFENDANTS | : | |

## RULING ON DEFENDANTS' RENEWED MOTION FOR JUDGMENT, AND MOTION FOR NEW TRIAL OR FOR REMITTITUR [DOC. # 545]

## I.   INTRODUCTION

On October 26, 2006, this Court entered Judgment for the plaintiff, Rand-Whitney Containerboard Limited Partnership ("Rand-Whitney"), in the amount of $13,585,839.38.[1]  On November 9, 2006, defendants Town of Montville and Town of Montville Water Pollution Control Authority ("Town")filed post-judgment motions, renewing their motion for judgment as a matter of law, seeking a new trial, and requesting a remittitur.  [Doc. #545].

For the reasons that follow, defendants' renewed motion for judgment as a matter of law, motion for a new trial, and motion for remittitur are **denied.**  [Doc. #545].  The Amended Judgment entered on February 27, 2007, remains in full force and effect.

---

[1]  An Amended Judgment was entered on February 27, 2007, to include additional attorneys' fees and costs in the amount of $94,008, for the period of October 2005 through December 2006.

## II.  **FACTUAL BACKGROUND**

The issues presented in this motion arise from the trials conducted in 2002 and 2005, as well as from pre/post-trial rulings.  The Court assumes familiarity with these facts, and will discuss only those facts essential to the disposition of these motions.

This case revolved around disputes which arose under agreements entered into by the parties to develop and operate a $110 million manufacturing plant in the Town of Montville.  The Town undertook to supply the plant with water of a defined quality, necessary for the plant's operation, and to treat the plant's effluent through its municipal waste treatment system. From the beginning of plant operations, the Town was unable to supply water of the specified quality.  Specifically, the level of Total Dissolved Solids ("TDS") in the municipally supplied water exceeded the contractual standard.  The Town attributed its inability to comply to its difficulties in treating the plant's effluent, as the Town's system involved recycling the plant's wastewater through the treatment facility and back to the plant.

For several years, the parties worked together to develop alternative methods of supply and treatment.  The agreed upon technological solution - to separate the waste streams and treat and dispose of the plant effluent separately from municipal waste water - was thwarted when the Connecticut Department of Environmental Protection ("DEP") denied the necessary permits.

At the trial, the Town claimed that it was fraudulently induced to enter into the Supply and Treatment Agreements by misrepresentations as to the quality/amount of the plant's effluent, and sought damages for various breaches of the agreement. The 2002 jury found that defendants proved, by clear, precise, and unequivocal evidence, their fraud counterclaim and affirmative defense. More specifically, with respect to their fraud defense and counterclaim, the 2002 jury found that defendants proved, by clear, precise, and unequivocal evidence, that: (1) they relied on a representation from plaintiff regarding water quality; (2) they were induced to enter into the Supply Agreement by that representation; (3) plaintiff made that representation with intent to deceive and regarding a belief that it did not in good faith entertain; and (4) the representation proved untrue. Jury Interrogatories, doc. # 248. The jury also found, by a preponderance of the evidence, that plaintiff breached the covenant of good faith and fair dealing in the Supply and Treatment Agreements. Id. With respect to the covenant of good faith and fair dealing, the jury found that defendants proved, by a preponderance of the evidence, that a covenant of good faith and fair dealing applied at the time of, and with respect to, the negotiations leading to the June 29, 1993 Supply and Treatment Agreement; that plaintiff breached that covenant, and that defendants had suffered at least some damages. Id., Nos. 21-23. Lastly, the jury found that plaintiff proved, by a preponderance of the evidence, that defendants breached the

Modification Agreement with respect to Service Fees and awarded damages in the amount of $344,872. Id., Nos. 15-16.[2]

After the jury verdict, plaintiff moved for judgment as a matter of law or, in the alternative, for a new trial. [Doc. #299]. Plaintiff argued that: (1) defendants failed to prove every element of their fraud claim and defense, and, in fact, ratified the very agreements they challenged; (2) the court improperly instructed the jury on finding fraudulent intent and on the covenant of good faith and fair dealing; and (3) defendants not only failed to prove every element of their claim regarding the covenant of good faith and fair dealing, but they never even pleaded such a claim. Id.

On September 30, 2003, the Court set aside the jury's verdict on the fraud counterclaim, ruling that there was insufficient evidence to support its finding. See Ruling on Plaintiff's Motion for Judgment, or, in the Alternative, for a New Trial (September 30, 2003). [Doc. #316]. As defendants had no remaining defenses to liability, a second trial on plaintiff's damages and defendants' defenses to damages was held in May, 2005. The 2005 jury delivered a verdict in favor of plaintiff in the amount of $10 million. As part of their deliberations, the Court asked the 2005 jury, by interrogatory, to determine whether Section 11.1 of the Water Supply Agreement applied to "claims

---

[2] The jury also found that these damages constituted a clearly established obligation due and owing to plaintiff that was wrongfully detained by defendants. [Doc. # 248, No. 17.]

between Rand Whitney and Montville." [Jury Instruction 5].[3] The 2005 jury's response to this question was understood by the parties to be determinative of the question of whether attorneys' fees and costs could be recovered by a party to this litigation. The 2005 jury found that Section 11.1 did apply to claims between Rand-Whitney and Montville.

## III. **STANDARD OF REVIEW**

A motion for judgment as a matter of law is brought pursuant to Rule 50(b) of the Federal Rules of Civil Procedure. The standard under Rule 50 is similar to the standard for summary judgment under Rule 56. In reviewing a motion for judgment, the

---

[3] The Court instructed the jury:

"You must determine what the parties intended by this provision, and specifically whether, at the time of the contract, the parties intended it to apply to claims between Rand-Whitney and Montville. Intent is determined from the language used in the agreement, interpreted in light of the surrounding circumstances, and in light of the motives of the parties and the purposes which they sought to accomplish ...."

The court also instructed the jury on giving a "a fair and reasonable construction of the written words;" construing Section 11.1 in light of the other contract provisions; the parole evidence rule; "reading each provision in light of the other provisions, and giving effect to every provision if it is possible to do so, so that the contract as a whole makes sense;" integration clauses; the circumstances surrounding the drafting of the term ("when choosing among reasonable meanings of an ambiguous agreement or term, where both parties have not had input into the drafting, you may choose the meaning that operates against the party that supplied the words you are considering. This may not apply when the contract terms have been negotiated. It is up to you to decide what significance, if any, to attach to any evidence you heard about how this provision came into being."). Finally, the court instructed the jury that, "[d]epending on your finding, the court will determine what amount is due Rand-Whitney under Section 11.1." Jury Charge.

court must view the evidence in a light most favorable to the non-movant and grant that party every reasonable inference that the jury might have drawn in its favor. See Samuels v. Air Transp. Local 504, 992 F.2d 12, 14 (2d Cir. 1993). Thereafter, a court may enter judgment as a matter of law only if: (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture; or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded jurors could not arrive at a verdict against the movant. See Ahern v. County of Nassau, 118 F.3d 118, 120 (2d Cir. 1997). The court may not weigh the credibility of the witnesses or evaluate the weight of the evidence. Williams v. County of Westchester, 171 F.3d 98, 101 (2d Cir. 1999). Moreover, since a grant of a motion for judgment would essentially deprive the party of a determination of the facts by a jury, it should be cautiously and sparingly granted. See Weldy v. Piedmont Airlines, Inc., 985 F.2d 57, 59 (2d Cir. 1993).

A post-trial motion for judgment under Rule 50 is a renewal of an earlier motion made at the close of the evidence and can be granted only on grounds advanced in the pre-verdict motion. Fed. R. Civ. P. 50 advisory committee's note (re 1991 Amendment, Subdivision (b)) (citing Kutner Buick, Inc. v. American Motors Corp., 868 F.2d 614 (3d Cir. 1989)). The rules limit the grounds for post-verdict judgment as a matter of law to those "specifically raised" in the pre-verdict motion. Lambert v.

<u>Genesee Hosp.</u>, 10 F.3d 46, 53-54 (2d Cir. 1993) (citations and internal quotations omitted). Thus, the motion cannot assert new grounds.

A motion for a new trial is brought pursuant to Rule 59 of the Federal Rules of Civil Procedure. Under that rule, a motion for new trial should not be granted unless, in the opinion of the district court, the jury has reached a seriously erroneous result, or the verdict is a miscarriage of justice. <u>See</u> <u>Song v. Ives Labor, Inc.</u>, 957 F.2d 1041, 1047 (2d Cir. 1992). Unlike a motion for judgment, a new trial may be granted even if there is substantial evidence supporting the verdict, and the court is free to weigh the evidence. However, a new trial should be granted only if the jury's verdict is egregious. <u>DLC Mgmt. Corp. v. Town of Hyde Park</u>, 163 F.3d 124, 133-34 (2d Cir. 1998). As the Court of Appeals has warned, a jury's verdict should rarely be disturbed. <u>Peggy Farrior v. Waterford Bd. of Educ.</u>, 277 F.3d 633, 635 (2d Cir. 2002). The decision to grant a new trial is "committed to the sound discretion of the trial judge." <u>Metromedia Co. v. Fugazy</u>, 983 F.2d 350, 363 (2d Cir. 1992).

Here, defendants claim that they are entitled to a new trial on five grounds: 1) the Court applied an erroneous standard in overturning the jury verdict as to defendants' fraud defense and counterclaim; 2) plaintiff's alleged breach of the implied covenant of good faith and fair dealing was a material breach precluding the recovery of damages, including fees and costs; 3) the Court entered, in error, a *sua sponte* summary judgment order

7

as to the defendants' impossibility and force majeure defenses;
4) the dismissal of defendants' impossibility and force majeure
defenses was in error; and 5) the submission of the
indemnification provision to the jury was in error.
Additionally, the defendants allege that the $10 million verdict
was not supported by the evidence, was based on a
misunderstanding of the evidence, is grossly unfair, and shocks
the conscience.

In its opposition, plaintiff asserts that the first, second,
fourth, and fifth arguments have previously been raised by
defendants and ruled on by the Court, more than once.  The Court
agrees.  As to these arguments, defendants have not raised new
case law supporting their allegations of error and rely solely on
their previous recitation of the law.  Defendants also argue
similar facts, albeit in slightly different language.  These
attempted factual distinctions carry no weight.  More
importantly, defendants' motion disturbingly and repeatedly
distorts and mischaracterizes the record and misstates the
facts.[4]

---

[4]  The Court intends, by pointing out these
mischaracterizations, to give the defendants an opportunity to
review and correct them before repeating them - and potentially
exposing themselves to Rule 38 or 28 U.S.C. § 1927 sanctions -
before the Court of Appeals.  See generally, 60 East 80th Street
Equities, Inc. v. Sapir, 218 F.3d 109, 118-20 (2d Cir. 2000)
(noting that sanctions have been awarded, even without a showing
of bad faith, where the appeal is groundless, without foundation,
or where an attorney has "recklessly disregard[ed] [his] duties
to the court.") (quoting Braley v. Campbell, 832 F.2d 1504, 1512
(10th Cir. 1987)).

Defendants' motions for judgment and new trial on the first, second, fourth, and fifth arguments merely rehash and reargue issues previously raised and addressed by the Court. This is an inappropriate use of Rule 59. "It is well-settled that Rule 59 is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a 'second bite at the apple'." Sequa Corp. v. GBJ Corp., 156 F.3d 136, 144 (2d Cir. 1998) (citations omitted). See also Sassower v. Field, 973 F.2d 75, 81 (2d Cir.), cert. denied, 507 U.S. 1043 (1993) (denial of new trial motion was affirmed where "motion was nothing more than reargument of claims made at trial"). Defendants cannot resort to Rule 59 to relitigate issues that have been resolved to their dissatisfaction. Defendants must show there was a manifest error and that the error was "inconsistent with substantial justice." Fed. R. Civ. P. 61. As defendants have failed to meet this standard, their motions for judgment and new trial on the first, second, fourth, and fifth arguments are denied. However, so there is no misunderstanding about the state of the record and the bases for the Court's rulings, each argument is addressed below. If the argument has already been raised and ruled on, the Court will briefly summarize its previous factual findings and holdings.[5]

---

[5] The Court incorporates, by reference, the following Rulings: 1) Ruling on Plaintiff's Motion for Judgment, or, in the Alternative, for a New Trial [Doc. #316]; 2) Order dated February 28, 2005 [Doc. #350]; 3) Ruling on Motion to Preclude

## IV.  **Defendants are not Entitled to a New Trial**

### A.    **Defendants' Fraud Defense and Counterclaim were Properly Dismissed**

The defendants claim that the Court erred in overturning the 2002 jury verdict which sustained the fraud defense.  In support of this argument, defendants allege, 1) that the Court applied the wrong burden of proof; 2) that the defendants proved detrimental reliance; and 3) that the Court erred in construing Tom Bowen's ("Bowen") segregation plan in the light most favorable to the plaintiff.  Plaintiff argues that the Court did apply the appropriate burden of proof and that defendants did not prove detrimental reliance.

#### 1.    **The Legal Standard for Fraud**

In its 2002 jury charge and recharge, the Court instructed the jury that the reliance element of fraud must be proved by clear, unequivocal, and precise evidence.  2002 Jury Charge at 6; Recharge 8/8/02 Tr. at 15.  Defendants argue that this is not the appropriate burden of proof, and that the element of reliance need only be proved by a preponderance of the evidence.  Defs'. Memo. p. 4.  In support of this argument, defendants rely on the cases of <u>Weisman v. Kaspar</u>, 233 Conn. 531, 533-34 (1995), and <u>Kilduff v. Adams</u>, 219 Conn. 314, 327-330 (1991).  Defendants

Expert Report and Testimony [Doc. #365]; 4) Ruling on Motion for Reconsideration of the Court's Ruling on Motion to Preclude Expert Report and Testimony [Doc. #489]; 5) Ruling on Defendants' Motion for Summary Judgment as to Plaintiff's Claim for Damages [Doc. #497]; and 6) Ruling on Plaintiff's Motion on Entitlement to Recover Fees and Costs.

misconstrue the holdings in these two cases.

The party claiming fraud has the burden of proving the essential elements of common law fraud, which are: "(1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon that false representation to his injury." Duplissie v. Devino, 96 Conn. App. 673, 681 (2006). The first three elements of fraud must be proven by "clear and satisfactory or clear, precise and unequivocal, evidence." Weisman, 233 Conn. at 534. The only element to which the lesser standard of preponderance of the evidence applies is the damages element. Kilduff v. Adams, Inc., 219 Conn. 314, 327-28 (1991) (plaintiffs required to prove damages by a preponderance of the evidence and "all other elements of fraud by clear and satisfactory evidence"); Weisman, 233 Conn. at 540, n. 7 ("all of the elements of the cause of action [must be] prov[ed] by clear and satisfactory evidence"). Thus, the element of reliance must be proved by clear, precise and unequivocal evidence.

However, its is unnecessary to dwell on the issue of what standard was, or should be, applied. In granting plaintiff's motion for judgment, the Court found that defendants failed to offer **any** proof that a false misrepresentation was made on which defendants relied. Therefore, under either a "preponderance of evidence" standard, or a "clear, precise and unequivocal evidence" standard, the fraud claim fails.

11

## 2.  **Defendants Failed to Prove Detrimental Reliance**

Defendants allege that evidence of the Town's reliance on representations made by plaintiff's agents as to the quality of the effluent at the mill came from several sources.  Defendants claim that such reliance can be inferred from, 1) the circumstantial evidence, such as the testing that was actually done; 2) the proximity of statements made to the execution of the agreements; 3) the fact that the Town hired CEE, plaintiff's engineers; and 4) the testimony of Mitch Suzich of SCRRA regarding a meeting about how leachate would affect contract effluent numbers.  Defs'. Memo. pp. 6-7.

As stated in its previous ruling on plaintiff's motion for summary judgment [Doc. # 316], the Court finds, based on the trial record, that only one person, Tom Bowen, the superintendent of Montville's publicly owned treatment works ("POTW"), negotiated for the Town regarding the technical water-quality aspects of the Supply and Treatment Agreements.  7/27/02 Tr. 177[6]; 7/19/02 Tr. 192-93; 7/17/02 Tr. 68.  There was no evidence that anyone else represented defendants in these technical negotiations, was even aware of the "similarity" representations, or determined whether defendants could supply the quality of water that plaintiff needed.  <u>Id.</u>  The evidence was that,

---

[6] The court will refer to testimony by identifying the date of the testimony and the page of that day's transcript on which the testimony can be found (i.e., 7/22/02 Tr. 177).

- ▸ Bowen specifically stated that he did not rely on any statements of similarity and, in fact, did not rely on anything that he did not "check out" himself; 7/19/02 Tr. 194-196; 7/22/02 Tr. 147;

- ▸ Bowen recommended to town decision-makers that defendants enter into the Supply Agreement with plaintiff; See generally 7/19/02 Tr. 192-96; 7/22/02 Tr. 146-47;

- ▸ Bowen did not believe or depend on plaintiff's representation of similarity. Nor did he hope it proved correct. His plans were not dependent on any such expectation, and he prepared for the "worst case scenario."[7] 7/22/02 Tr. 145-46;

- ▸ All the parties were concerned with biochemical oxygen demand ("BOD") and total suspended solids ("TSS") in the water, but not TDS. In fact, Bowen testified that he did not "remember" whether TDS was ever discussed; 7/22/02 Tr. 141-42; see also 7/22/02 Tr. 158 ("my concerns with the old mill were always BOD and suspended solids"); 7/17/02 Tr. at 66, 70-71; 7/19/02 Tr. at 31-32.

These facts are important because of the nature of plaintiff's claim and defendants' defense and counterclaim. Rand-Whitney claimed that defendants breached the Supply Agreement by providing water with TDS levels higher than the Agreement allowed. Defendants' affirmative fraud defense and parallel counterclaim was that Rand-Whitney misrepresented the nature of the its future effluent, and that defendants could not comply with the TDS requirements in the Supply Agreement because of the unanticipated high TDS levels in plaintiff's effluent

---

[7] "I had always had the knowledge or the feeling that I could separate the two flows and I always had. The effluent of the plant was, at the present time, with the flows that were going through it, met the agreement. So, if I could separate off enough flow from the plant to send it back without the mixing of the new plant it wouldn't be a problem." 7/22/02 Tr. 145-46.

(which the Town treated and returned to plaintiff).  The fact
that Bowen did not rely on any similarity representations, was
not concerned with TDS, and specifically chose not to test for
TDS even though he had that capability, is fatal to defendants'
reliance claim, especially in light of the absence of any other
evidence supporting that claim.

In the present motion, defendants concede that when
disbelief of testimony is the only evidence of a fact, there is
not enough evidence to go to a jury.  Defs'. Memo. p. 6.  See
Dyer v. MacDougall, 201 F.2d 265, 268-69 (2d Cir. 1952)
(disbelief of a witness' testimony is insufficient to support a
verdict in the absence of other affirmative evidence) (emphasis
added).  Defendants claim, however, that disbelief of Bowen's
denials of reliance must be viewed in light of all the
circumstantial evidence of reliance.  Defs'. Memo. p. 6.  While
agreeing with defendants' theory, the Court finds such
circumstantial evidence does not exist.

Defendants claim that reliance is evident because the Town
hired plaintiff's engineers.  Once again, defendants fail to show
that Bowen, the only person responsible for negotiating on behalf
of the defendants, did rely on any alleged representations made
regarding the Mill effluent or that he was concerned about TDS.
Similarly, defendants cite the testimony and an exhibit of Mitch
Suzich, Executive Director of SCRRA, regarding a meeting
he had with Bowen.  What this testimony and document prove,
however, is that Bowen was concerned about preventing new lechate

14

waste from being sent to the Mill.  Mr. Bowen expressed this
concern by explaining his segregation plan to Mr. Suzich.  Defs'.
Exs. 3 and 4.  This circumstantial evidence does not support a
reliance claim, and primarily proves non-reliance.

Because there was no affirmative evidence of reliance,
defendants could not, as a matter of law, have met their burden
of proof based on the jury's disbelief of Bowen's denial of
reliance.  As stated previously,

> In sum, there was no evidence produced at trial that
> defendants relied on any Rand-Whitney representation
> regarding the characteristics of the new mill's
> effluent. Although Tom Bowen was the only person in a
> position to rely (in making his recommendation to town
> decision-makers), there is no evidence that he
> considered, let alone believed, any Rand-Whitney
> statement about TDS in the new mill effluent or that he
> depended on the truth of any such statement in
> recommending that the town enter the Supply Agreement.
> On contrary, there is direct evidence, his testimony,
> that he did <u>not</u> rely.

Ruling at 25-26.  [Doc. #316].

As there was a complete absence of evidence supporting the
jury's finding that Bowen relied, and direct evidence that Bowen
did not rely, on plaintiff's representations regarding the
quality of the future effluent, the Court affirms its entry of
judgment in favor of plaintiff on defendants' fraud defense and
counterclaim.  Defendants' motion for a new trial on the fraud
defense is denied.

### B.    The Breach of Covenant of Good Faith and Fair Dealing Finding did not Bar Plaintiff's Recovery or Entitle Defendants to Damages

Under the breach of covenant claim, defendants make two

15

arguments for a new trial.  First, defendants claim that the
Court erred by failing to rule, as a matter of law, that the
jury's determination regarding the breach of covenant claim
barred plaintiff from recovering damages.  Defs'. Memo. p. 10.
In support of this argument, defendants allege that a breach of
the covenant of good faith and fair dealing is a material breach,
and a party in material breach cannot recover damages.  <u>Id.</u> at
11.  Second, defendants allege that the Court erred in granting
summary judgment to plaintiff as to defendants' damages because
defendants proved reliance even though reliance is not an element
of contract damages.  <u>Id.</u> at 10.  Plaintiff contends these
arguments lack merit.

**1.**  **<u>The Breach of Covenant Finding Does not Bar</u>**
**<u>Plaintiff's Recovery of Damages</u>**

The Court first addressed this issue in an order dated
February 28, 2005.  [Doc. #350].  In that Order, the Court noted
that defendants could argue that plaintiff's bad faith
constituted a material breach, but that there were several
problems with this argument.  <u>Id.</u>  Most importantly, the Court
found that the defendants had failed to allege which undisputed
facts constituted bad faith.  Additionally, in the absence of a
jury determination as to materiality, the Court held that
defendants had to prove that the withheld information would have
been acted on.  <u>Id.</u>  Defendants addressed these issues in a
revised motion for summary judgment.  [Doc. #353].  Ultimately,

the Court denied defendants' motion for summary judgment on damages. [Doc. #497].

In their revised motion in support of summary judgment, defendants conceded that the Connecticut Supreme Court has not expressly articulated that a breach of the covenant of good faith and fair dealing necessarily constitutes a material breach of the substantive contract. [Doc. #497, p. 5]. Nonetheless, defendants now renew their argument, under related case law, that such a breach should be considered a material breach if it satisfies factors enumerated in <u>Bernstein v. Nemeyer</u>, 213 Conn. 665, 672 n.8 (1990).[8] When making this argument at the summary judgment stage, defendants cited to "a litany of factors from the first trial that they assert demonstrates the materiality of plaintiff's breach of covenant." [Doc. #497, p. 6]. Here, defendants have not pointed to any additional facts which demonstrate the materiality of plaintiff's breach. Thus, the

---

[8] "Section 241 of the Restatement (Second) of Contracts provides: 'In determining whether a failure to render or to offer performance is material, the following circumstances are significant:
(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
(b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.'" <u>Bernstein v. Nemeyer</u>, 213 Conn. 665, 672 n.8 (1990).

Court did not err in finding that,

> Defendants' interpretation of the facts
> mischaracterizes the testimony at trial and ignores the
> Court's September 30, 2003 ruling on this issue. The
> testimony at trial indicated that, even if defendants
> had known about TDS, Tom Bowen had always planned for
> segregation, and was therefore not concerned about
> levels of TDS in the effluent. See Ruling on
> Plaintiff's Motion for Judgment, Or, in the
> Alternative, for a New Trial (September 30, 2003), at
> 14-26. The Court exhaustively scrutinized the trial
> record and concluded that:
>
> > there was no evidence produced at trial that
> > defendants relied on any Rand-Whitney
> > representation regarding the characteristics
> > of the new mill's effluent. Although Tom
> > Bowen was the only person in a position to
> > rely (in making his recommendation to town
> > decision-makers), there is no evidence that
> > he considered, let alone believed, any Rand-
> > Whitney statement about TDS in the new mill
> > effluent or that he depended on the truth of
> > any such statement in recommending that the
> > town enter the Supply Agreement. On contrary,
> > there is direct evidence, his testimony, that
> > he did not rely.
>
> Id. at 25-26.
>
> Defendants' argument must therefore fail because they
> cannot show that they relied on plaintiff's
> representations, and would not have entered into 1993
> Agreements had they known about the TDS levels in Rand-
> Whitney's effluent. Defendants cannot circumvent the
> Court's ruling and create undisputed facts on this
> issue, post-trial, by submitting new evidence that was
> not presented to the first jury and is outside the
> trial record.

(Doc. #497, pp. 7-8).

As defendants have once again failed to identify any facts

to support their claim that the breach of covenant claim

constituted a material breach relieving them of any obligations

under the contract, including the payment of damages, defendants'
motion for new trial on this ground is denied.

## 2. The Reliance Arguments

Defendants next argue that the Court erred in finding that
reliance was an element of contract damages, that defendants did
not prove reliance, and that defendants were not entitled to
damages. Defs'. Memo. pp. 10-11. The defendants have
misinterpreted the Court's Rulings on defendants' damages claims.
[Docs. #376 and #497]. The Court never held that reliance was a
necessary element of contract damages. Instead, the Court found
that, based on the evidence presented, a reasonable juror could
not find that the breach of the covenant of good faith and fair
dealing was material. As there was no basis for a jury to find a
material breach, the Court held that defendant could not obtain
damages. [Doc. #497, p. 3].

Additionally, the Court did not preclude defendants' damages
based on the lack of reliance evidence. What the Court did find
was that the subsequent agreements entered into by the parties
precluded defendants' entitlement to damages as a matter of law.
Specifically, the defendants claimed the following damages
resulting from plaintiff's breach of the covenant of good faith
and fair dealing: 1) capital costs for engineering and
construction work done in connections with the design and

installation of the fourth SBR, listed in Schedule B(2);[9] 2) chemical costs incurred by the Town after June 1997 listed in Schedule C; 3) polymer costs incurred by the Town, listed in Schedule D; and 4) tax abatement losses.[10]  [Doc. #376, p. 6]. It is undisputed that the capital costs sought by defendants were precluded as a matter of law by the Settlement Order, which was valid and binding upon the parties.  Id. at 8-9.  Additionally, the "unambiguous terms of the Modification Agreement provide[d] that [plaintiff] will not be responsible for any costs beyond the Service Fee."  Id. at 10.  The Service Fee covered the chemical and polymer costs.  Id.  Thus, the subsequent agreements precluded defendants' recovery of the claimed damages.

In their final argument with respect to this issue, defendants briefly allege that the Court erred in interpreting defendants' motion as a request for rescission.  The defendants misstate the Court's prior holding.  The Court did state that if defendants were permitted to nullify the subsequent agreements, which they were not, this "would be the equivalent to allowing the Town to seek rescission of the contract."  Id. at 13.  The Court clearly noted that rescission was not sought or pled by the defendants.  Id.

For the reasons stated above, defendants' motion for new

---

[9]  These damages were in addition to those already paid under the terms of the Settlement Order.

[10]  The Town subsequently abandoned its claim for tax abatement losses.

trial regarding the breach of the covenant of good faith and fair dealing claim is denied.

### C. The Legal Impossibility, Physical Impossibility, and Force Majeure Defenses[11]

First, defendants claim that the Court erred by granting summary judgment *sua sponte* on the defendants' impossibility defenses, by failing to prove notice or the opportunity to be heard. Second, defendants claim that the Court erred in finding the impossibility defenses insufficient as a matter of law.[12]

#### 1. The Court did not Grant a *Sua Sponte* Summary Judgment

Defendants claim that they did not have an opportunity to present evidence regarding their impossibility defenses and, therefore, the Court's Rulings (Doc. ##365 and 489) precluding these defenses were a "*sua sponte*" summary judgment order. Defendants' representations concerning the facts and circumstances surrounding these Rulings are inaccurate.

Defendants first presented evidence regarding their legal

---

[11] Defendants raise two issues with respect to the legal and physical impossibility defense claims -- a procedural argument and a substantive argument. As the facts for both claims are the same, the Court will address these arguments together.

[12] In the title of Section D, defendants also claim error regarding their force majeure defense. However, defendants do not mention force majeure when presenting their arguments in this section or anywhere in this motion. As such, the Court will not consider the denial of the force majeure defense as a basis for defendants' motion.

and physical impossibility defenses during the 2002 trial.  2002
Trial Transcript.  The Court had previously ruled that the
defendants' legal impossibility defense was limited to the issue
of whether the Supply Agreement was rendered legally impossible
by the DEP's refusal to approve implementation of Phase II.  At
the end of the trial, the jury was charged on both the legal and
physical impossibility defenses.  2002 Jury Charge 52-70.

After the 2002 trial, but prior to the 2005 damages trial,
plaintiff consistently argued that defendants' impossibility
defenses were barred.  See Proposed Pretrial Order (March 4,
2005) and Memorandum in Support of the Proposed Pretrial Order
(March 4, 2005).  Although the defendants moved to preclude
plaintiff's expert from testifying as to the impossibility
defenses (see Doc. #340), defendants did not object to
plaintiff's proposed pre-trial order which sought to bar the
impossibility defenses.  However, on April 5, 2005, defendants
filed a Trial Memorandum arguing for, among many things, the
impossibility defenses.  [Doc. #361, pp. 3-7; 9].

In an effort to resolve some of the conflicts raised in the
numerous pre-trial filings, the Court held a Pretrial Conference,
**on the record**, on April 12, 2005.  The issues the Court asked the
parties to address included the legal and physical impossibility
defenses.  (4/12/05 Tr. 4, 24-59).  During their own presentation
and in response to plaintiff's arguments, as well as in response
to the Court's questions, the defendants exhaustively argued
their position regarding their ability to raise the impossibility

22

defenses at trial.  Id.

While this is certainly sufficient evidence to prove that
the Court did **not** grant a *sua sponte* summary judgment, the record
demonstrates that the Court gave defendants yet another
opportunity to argue the validity of their impossibility
defenses.  Following the Court's Ruling precluding the
impossibility defenses, [Doc. #365], the defendants filed a
motion for reconsideration.  [Doc. #368].  In support of this
motion, defendants filed a fourteen-page, detailed memorandum of
law, fully addressing their arguments on the impossibility
defenses, and attached six exhibits which totaled approximately
143 pages.  On August 26, 2005, the Court granted defendants'
motion for reconsideration and, once again, stated its basis for
precluding both the legal and physical impossibility defenses.
[Doc. #489].

The record is abundantly clear that the defendants had ample
notice and opportunity to address the impossibility defenses,
both before and after the Court ruled.  The record directly
contradicts the defendants' version of events.

## 2. <u>The Impossibility Defenses were Properly Rejected</u>

Defendants argue that the Court made two errors in finding,
as a matter of law, that the impossibility defenses were
precluded.  First, defendants allege that the Court improperly
misconstrued the contract.  Second, defendants allege that the
Court found that the 2002 jury's finding that plaintiff did not

prevent the implementation of Phase II defeated defendants'
impossibility defenses.[13]  Defs'. Memo. pp. 15-17.

### a.    Construction of the Contract

_____Defendants argue that the Court erred in concluding that,
under Section 6.6 of the Supply Agreement, defendants assumed the
risk of obtaining permits for Phase II.  Id.  In support of this
argument, defendants again define the terms "Project," "Permits,"
"Pre-Treatment Facility," and "Pipeline," and allege that "the
parties expressly excluded the sewage treatment plant where Phase
II would be implemented ...."  Id.  Defendants also claim that
subsequent agreements altered their permit obligations under the
1996 Supply Agreement.  These arguments were previously presented
to the Court in defendants' motion for reconsideration.

In rejecting the arguments as to Section 6.6 of the Supply
Agreement, the Court held that:

> There is no genuine dispute that the unambiguous terms
> of the Supply Agreement allocated to the Town the
> responsibility to "obtain all permits necessary to
> construct the Project and to operate the Pipelines and
> the Pre-Treatment Facility and shall ensure that the
> Project is constructed and operated in compliance with
> all Environmental Laws and Permits." Supply Agreement
> Section 6.6.  None of the subsequent agreements entered
> into by the parties relieved the Town of this
> obligation.  Given the Town's assumption of the risk of
> the DEP's approval, and the jury's finding that Rand-

---

[13]    During the first trial, the Town attempted to prove that
Rand-Whitney was at fault for the DEP's decision not to approve
the implementation of Phase II.   The jury was asked, in
connection with the Town's claim for quantum meruit, whether
Rand-Whitney prevented the implementation of Phase II.  Charge at
89.  The jury found that Rand-Whitney did not prevent the
implementation of Phase II. Jury Interrogatory 24.

Whitney was not at fault for the DEP's disapproval of Phase II, the Town would not be able to argue any set of facts that would satisfy the legal impossibility test. Because any other argument by the Town would necessarily be an improper one, the Town may not argue legal impossibility as a defense to damages during the second trial.

Without legal impossibility available as a defense, the Town would also be unable to prove a set of facts in support of their physical impossibility defense. In order for the Town to prevail on this defense, they would have to show that there were no options available to them that were physically possible. In other words, if one option remained physically possible, then no physical impossibility results. The Town has never argued that Phase II was physically impossible- their argument is that the implementation of Phase II was *legally* impossible. Because Phase II was not physically impossible, and cannot be found legally impossible, the defense of physical impossibility is also precluded as a matter of law.

[Doc. #365, pp. 3-5] (footnotes omitted).

In reconsidering the defendants' arguments, the Court reaffirmed its Ruling holding that:

By including [§ 6.6] language, the parties acknowledged that additional measures might have been necessary in order for the Authority to be able to comply with its obligations under the agreement. After the Town's breach, the parties agreed to the implementation of Phase II as an effort to remedy the breach and settle the lawsuit. As such, it was also within the Authority's obligation to take all other actions to ensure that it could perform Phase II. The Court finds that this language clearly encompasses the duty to obtain the permits to complete Phase II. Defendants are incorrect that the language of the Supplemental Stipulated Settlement Order relieved or modified defendants' obligation to obtain permits. That agreement did not alter the original contract obligations of the Town with regard to permits, but rather addressed what would occur with respect to Phase II if the DEP in fact prohibited its implementation.

[Doc. #489, p. 5].

In renewing their arguments regarding the impossibility defenses, the defendants have failed to offer any new evidence or law regarding these issues. Instead, defendants simply reargue all the issues previously addressed. Without more, defendants' claims do not support a motion for new trial.

**b.  The 2002 Jury's Finding that Plaintiff was not at Fault**

Defendants allege that the Court erred in finding that the "jury's determination that [plaintiff] did not prevent implementation of Phase II" defeated the defendants' impossibility defenses. Defs'. Memo. p. 16. The defendants' interpretation of the Court's holding is inaccurate. The Court did not find that the jury determination regarding lack of fault on behalf of plaintiff prevented the impossibility defenses. Instead, the Court

> eliminated the legal impossibility defense on the grounds that the defendants had clearly assumed the risk of obtaining the required permits for Phase II. Thus, whether the Town was at fault for the alleged legal impossibility in some way independent of the permit issue is irrelevant. The Court discussed the jury's findings on the quantum meruit claim in order to foreclose any argument that Rand-Whitney improperly interfered with the DEP's decision. If Rand-Whitney had so interfered, then the Town's assumption of the risk of obtaining the permits would not be a bar to its legal impossibility defense.

[Doc. #489, p. 4]. Thus, defendants' motion for new trial based on their misinterpretation of the Court's Ruling must be denied.

**D.  The Indemnification Provision**

Defendants claim that the Court made three errors with

26

respect to the indemnity provision: 1) that the "unmistakably clear" standard applies and the indemnity provision does not meet that standard; 2) that the indemnity provision is unambiguous and should not have been submitted to the jury; and 3) that the verdict is against the weight of the evidence. Defs'. Memo. pp. 17-23.

### 1.   The "Unmistakably Clear" Standard[14]

Defendants argue that they are entitled to a judgment as a matter of law or a new trial on the issue of indemnification because it is not "unmistakably clear" that the indemnification provision provides for attorney's fees and costs for this breach of contract claim. Defs'. Memo. p. 17.

The parties agree that, in federal practice, the "American Rule" governs whether attorney's fees are awarded. Under the American Rule, each party bears its own attorneys' fees. McGuire v. Russell Miller, Inc., 1 F.3d 1306, 1312 (2d Cir. 1993); Hensley v. Eckerhart, 461 U.S. 424, 429 (U.S., 1983); Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240 (1975).

---

[14]   Plaintiff argues that defendants have waived this argument by failing to submit a jury instruction proposing "unmistakably clear" language and by failing to object to the charge on the ground that "unmistakably clear" language was not submitted to the jury.  Pl's. Memo. p. 18-19.  Although the Court previously found that defendants were not entitled to reciprocal rights with respect to attorneys' fees and costs for the breach of covenant claim as such claim was not pled in their counterclaim, this finding is not dispositive of "unmistakably clear" issue raised in this motion.  [Doc. #502, p. 19]. However, as the Court finds that the "unmistakably clear" standard is not the appropriate standard under Connecticut law, the Court will not reach the waiver argument.

However, there is an exception to this rule.  Parties may
contract to permit recovery of attorneys' fees if the contract is
valid under applicable state law.  McGuire, 1 F.3d at 1313;
Alland v. Consumers Credit Corp., 476 F.2d 951, 956 (2d Cir.
1973).

In their objection to plaintiff's motion for fees and costs,
defendants urged the Court to follow the "unmistakably clear"
standard articulated in United States Fid. & Guar. Co. v.
Braspertro Oil Servs. Co., 369 F.3d 34, 75 (2d Cir. 2004) ("it is
well settled in New York law that ... the court should not infer
a party's intention to waive the benefit of the [American Rule]
unless the intention to do so is unmistakably clear.").  In
rejecting this argument, the Court found that the "unmistakably
clear" standard was an application of New York law and that the
Connecticut courts had not explicitly adopted this standard.
[Doc. #509, p. 8].  Instead, the United States Court of Appeals
for the Second Circuit noted that the proper procedure under
Connecticut law is:

> when a contract provides for an award of
> attorney's fees, the jury is to decide at
> trial whether a party may recover such fees;
> if the jury decides that party may recover
> attorneys' fees, then the judge is to
> determine a reasonable amount of fees.

McGuire, 1 F.3d at 1313.

In this motion, defendants again urge the Court to adopt the
"unmistakably clear" standard.  However, defendants do not cite
new case law supporting their position and, in fact, concede that

the Connecticut Supreme Court "has not yet ruled on this precise
issue." Defs'. Memo. p. 18. Absent a showing that Connecticut
has overturned the standard articulated by the Court of Appeals,
this Court did not err in finding that the jury must decide
whether attorney fees should be awarded under a contract that
allows for fees. [Doc. #502]. Based on this argument,
defendants' motion for a judgment as a matter of law or for a new
trial must be denied.

### 2. The Court did not Err in Submitting the Indemnification Issue to the Jury

Prior to the 2005 trial, plaintiff argued that the
indemnification provision was clearly intended to apply to a
lawsuit between the parties, and defendants argued that the
provision clearly did not apply to a suit between the parties.
Based on the divergent views, the Court determined that the
meaning of the indemnification provision was ambiguous and
parties' intent was a question of fact for the jury. [Doc. #502,
p. 3].

Defendants re-assert their argument that the language of the
indemnification clause was not ambiguous and, therefore, should
not have been submitted to the jury. Defs'. Memo. p. 19. In
support of this argument, defendants rely on the case of Amoco
Oil Co. v. Liberty Auto and Elec. Co., 262 Conn. 142 (2002).
Defendants cite Amoco Oil for the proposition that, "the
definition and common understanding of the word 'indemnification'
precluded consideration by the jury of its application in a

dispute between the parties." Defs.' Memo. p. 19.  Defendants'
interpretation is slightly skewed.  The Amoco Oil court found
that plaintiff could not "convert, for purposes of determining
the applicable statute of limitations and accrual date, what
otherwise is a breach of contract claim into an indemnification
claim simply by labeling it as such in the pleadings."  Amoco
Oil, 262 Conn. at 152.  While acknowledging that indemnification
agreements typically involve third-party claims, the Amoco Oil
court did not state that indemnification agreements must always
involve third-party claims.  The case also did not suggest that a
court should apply a heightened standard in determining whether
to submit an ambiguous indemnification provision to a jury.

      Additionally, defendants claim that one Connecticut Superior
Court has taken the holding in Amoco Oil to the next step.  Conn.
Res. Recovery Auth. v. Murtha Cullina, LLP., No. X-2CV020174569S,
2006 WL 1530158 (Conn. Super. May 23, 2006).  In Conn. Res.
Recovery Auth., plaintiff sought damages from three law firms
that provided legal services in a restructuring transaction.  Id.
at *1.  In the representation agreement signed by the parties,
there was an indemnification provision.  Id.  The indemnification
clause in Conn. Res. Recovery Authority, unlike the indemnity
clause found in Section 11.1,[15] "did not support a direct breach

_____

      [15] Section 11.1(a) provides, in relevant part, that:

      each party shall indemnify ... the other party ...
      against all damages, losses or expenses suffered or
      paid as a result of any and all claims, demands, suits
      penalties, causes of action, proceedings, judgments,

30

of contract claim for first party losses." <u>Id.</u> at *3.  In this
case, the indemnification provision was ambiguous as to whether
it provided for recovery for first party losses.  <u>See</u>, note 15.

     As previously stated,

> <u>McGuire v. Russell Miller, Inc.</u>, 1 F.3d 1306
> (2d Cir. 1993) establishes that, in the
> Second Circuit, where contract language is
> ambiguous, the jury should determine whether
> a contractual indemnity applies to a suit
> between the parties.  Although the amount of
> fees was the primary issue in <u>McGuire v.
> Russell Miller</u>, its holding on the procedural
> question about how to resolve a contract
> ambiguity applies to this case.  In <u>McGuire
> v. Russell Miller</u>, if there had been no
> dispute about the applicability of the
> provision to a suit between the parties, it
> can be reasonably assumed that the court
> would not have submitted the question to the
> jury in the first place.  In any event, the
> court's decision on remand clarifies that the
> parties were not in agreement about the
> application of the provision.

[Doc. 501, pp. 11-12].

     As the meaning of the indemnification provision was
ambiguous and because Connecticut law requires juries to
determine ambiguous questions of fact, defendants' motion for new
trial, based on the alleged manifest error in construing the

_____

> administrative and judicial orders and liabilities
> (including reasonable counsel fees incurred in any
> litigation or otherwise) **assessed, incurred or
> sustained** by or against such other party ... with
> respect to or arising out of ... any breach by the
> indemnifying party of its warranties, representations,
> covenants or agreements ..., including ... the failure
> to deliver Treated Water which complies with the volume
> and quantity standards set forth [in the Supply
> Agreement]...   (emphasis added)

language in the indemnification provision and in submitting the issue to the jury, is denied.

### 3. __The Jury Verdict is Supported by the Evidence__

Defendants' final claim with respect to the indemnification provision alleges that the jury's finding "that Section 11.1 applied to [this] lawsuit between the parties was substantially against the weight of the evidence of the parties' intent." Defs'. Memo. p. 19. In support of this argument, defendants allege that, 1) plaintiff failed to offer any evidence that the parties agreed that the indemnification would apply to lawsuits between the parties; 2) Michael Hillsberg's testimony demonstrated that this was not the intent of the parties; 3) objections to a certain line of questioning were improperly sustained; and 4) Exhibit 724, marked for identification, was improperly excluded as a full exhibit.

On review, the evidence submitted at trial was sufficient for a reasonable jury to find that the indemnification provision applied to litigation between the parties. The evidence consisted of the terms of the indemnity provision and testimony from James Cobery and Michael Hillsberg. Cobery's testimony was clear that plaintiff intended the indemnification provision found in Section 11.3 to apply to third party claims only, and that the indemnity provision found in Section 11.1 was "designed to take into account all claims either by a third party or a capital P party against another capital P party." 5/17/05 Tr. 205. Subsequently, Cobery testified that Section 11.1 was to cover

"all claims made by any parties." Id. This alone is sufficient
to defeat defendants' claim that the plaintiff failed to produce
any evidence from which a reasonable juror could find that
Section 11.1 was meant to apply to litigation between the
parties.

Defendants allege that the trial testimony of Hillsberg
demonstrates that the parties never intended Section 11.1 to
apply to lawsuits between the parties. The Court disagrees.
Hillsberg testified that he "was against this indemnification
provision being put into the contract." 5/19/05 Tr. 44. When
asked why, Hillsberg stated that he felt "a small town and a
working-class town ... couldn't afford to be indemnifying a
private corporation." Id. Hillsberg remembers trying to change
the language and voicing his concerns about the inclusion of the
language. Id. at 45-46. It is clear from Hillsberg's testimony
that he believed the draft indemnification clause was intended to
apply to litigation between the parties, and this caused him
concern. Despite his efforts to change the draft language, the
indemnification clause in Section 11.1 of the signed Supply
Agreement was virtually identical to the draft language in
Exhibit 724. From this evidence, it was certainly reasonable for
a jury to find that the defendants knew that the language of the
provision covered litigation between the parties, and, even
though they disliked the language, they agreed to it by executing
the final Supply Agreement which contained the so-called
"offensive" language.

Defendants also reassert allegations regarding the propriety of the Court's evidentiary rulings during the testimony surrounding the indemnification issue. First, defendants argue that the "evidence was improperly foreshortened by the Court's rulings on Plaintiff's objections during Hillsberg's testimony." Defs'. Memo. p. 22. Second, defendants claim that the Court improperly excluded defendants' Exhibit 724, which contained the handwritten phrase "'when hell freezes over' next to the crossed-out indemnification provision." Id. at 23.

A review of the transcript indicates that the Court sustained several objections to questions posed by defendants' counsel. However, it is clear from the transcript that the Court did not sustain the objections based on the substance of the proffered testimony. Instead, the objections were sustained based on the form of the questions. The following are rudimentary examples of questions which are leading, compound, and call for speculation/hearsay:

> Q: Was the -- did you ever discuss with anybody at Rand-Whitney the idea that this might be construed to authorize Rand-Whitney to get legal fees? --
> **(this question is clearly leading)**
>
> Q: And during that period of time did you ever expect the contract would be used as a basis for legal fees? --
> **(as there was no evidence that Hillsberg's expectations were relevant, the objection was sustained based on relevance and for lack of proper foundation)**
>
> Q: Did you or anybody in the town's team foresee that damages for failure to provide treated water could include legal fees? --
> **(this question is a compound question and Hillsberg cannot speculate what others foresaw).**

After the objections were sustained, defendants could have attempted to reframe the questions to comply with the Federal Rules of Evidence. Defendants did not do so.

Defendants also claim that the exclusion of defendants' Exhibit 724 was improper. Exhibit 724 is a draft copy of the Supply Agreement. The Court is sure that the parties recognize that, in accordance with the Federal Rules of Evidence, the executed Supply Agreement is the "best evidence" and was admitted as a full exhibit. The Court also notes that Exhibit 724 was not excluded based on its draft format. Instead, the Court excluded Exhibit 724 based on defense counsel's failure to state the relevance of the exhibit or to lay a proper foundation. After their first attempt to offer the exhibit, defense counsel accepted the Court's ruling and never attempted to correct the foundational flaw.

Defendants argue that the relevance of Exhibit 724 is evident from the hand-written notation, "when hell freezes over," which allegedly appears next to the crossed-out indemnification provision. Defs'. Memo. p. 23. Defendants again misstate the record. The notation "when hell freezes over!" does not appear next to the allegedly "crossed-out" indemnification provision and, in fact, the indemnification provision is not crossed out.[16]

---

[16]  As the phrase does appear on page ten, next to § 3.5 of the draft contact, obviously defendants erred in making this argument. It is difficult to understand how counsel could mis-attribute language from a section and a page that is fourteen pages removed the indemnification provision at issue.

The hand-written notation that does appear near the indemnification provision, Section 11.1., is, "what the hell does this say?"  Although defendants claim that this "colorful language" demonstrates the defendants' intent with respect to the indemnification provision, the two phrases have quite different meanings and support quite different inferences.[17]

Lastly, the Court finds merit in plaintiff's argument that even if the phrase appeared where alleged and it was error not to admit Exhibit 724, defendants were not harmed by its exclusion.  Clearly, defendants interpret this "colorful phrase" to show that defendants opposed the indemnity clause because it included litigation between the parties.  However, defendants ultimately executed the Supply Agreement containing identical language.  Thus, even if admitted, this document demonstrates that, although they initially objected, defendants finally acquiesced to the disputed language.

Defendants' motion for new trial based on the alleged evidentiary errors surrounding the meaning of the indemnification provision is denied.

---

[17]   The phrase "when hell freezes over" suggests that the author was saying "absolutely not." However, from the phrase "what the hell does this say," one infers that the author was colorfully asking for clarification.

## V.   **The Damages Award**[18]

Defendants seek a new trial or an order of remittitur with respect the $10 million jury award.  In making this claim, defendants argue that, 1) the jury awarded $1.81 million more than requested by the plaintiff; 2) the evidence supporting the lost profits claim was flawed, supported by speculation and unsupported assumptions, based upon a misleading manipulation of the raw production data, and the Transaction Impact Analysis "cherry-picked" transition periods; and 3) the future lost profits loss was flawed because it did not incorporate the trend toward efficiency in production.  Defs'. Memo. pp. 25-40.

### A.   **Standard of Review**

Numerous Connecticut court cases have held that, "[t]here are serious constitutional issues posed by setting aside a jury verdict ... because litigants have a constitutional right to have issues of fact decided by the jury." Creem v. Cicero, 12 Conn. App. 607, 609 (1987) (citing Bambus v. Bridgeport Gas Co., 148 Conn. 167, 169 (1961) and Zarrelli v. Barnum Festival Society, Inc., 6 Conn. App. 322, 326, cert. denied 200 Conn. 801 (1981)). As such, a court should be cautious in setting aside a jury verdict, and "especially hesitant [in setting aside] a jury award

---

[18]   Defendants' Memorandum contains two separate sections regarding damages.  See II.F and III.  As the arguments presented in Section II.F are fully addressed in Section III, the Court will address all the issues raised under this heading.

37

of damages." <u>Rejouis v. Greenwich Taxi, Inc.</u>, 57 Conn. App. 778, 784 (2000).

"In considering a motion to set aside the verdict, the court must determine whether the evidence, viewed in a light most favorable to the prevailing party, reasonably supports the jury's verdict." <u>Cheryl Terry Enter., Ltd. v. Hartford</u>, 270 Conn. 619, 639 (2004). The verdict should be considered in accordance with the premise that, in order to support a damages award, the evidence must provide the "finder of fact a reasonable basis upon which to calculate the amount of damages." <u>Sir Speedy, Inc. v. L & P Graphics, Inc.</u>, 957 F.2d 1033, 1038 (D. Conn. 1992). Although juries should not be allowed to guess or speculate, the evidence need not prove the loss with "mathematical precision." <u>Id.</u> "The trial court should not set a verdict aside where there was some evidence upon which the jury could reasonably have based its verdict ...." <u>Am. Nat'l Fire Ins. Co. v. Schuss</u>, 221 Conn. 768, 774 (1992).

If a trial court does find that the amount of damages awarded is excessive in light of the evidence presented, it may order a new trial, order a new trial as to damages, or "under the practice of remittitur, may condition a denial of a motion for a new trial on the plaintiff's accepting damages in a reduced amount." <u>Tingley Sys., Inc. v. Norse Sys., Inc.</u>, 49 F.3d 93, 96 (2d Cir. 1995).

**B.** **There was Ample Evidence to Support the Jury Verdict**[19]

_____Defendants argue that, based on the evidence, the $10 million jury verdict exceeded the damages claimed by plaintiff by over one million dollars. Id. at 25. In support of this argument, defendants claim that there were two pieces of evidence which demonstrated the amount of damages. First, defendants refer to the summary of damages ("Summary") submitted by plaintiff. Defs'. Ex. 11, P. Trial Ex. 108A. Defendants claim that this Summary evidenced lost profits of $6,965,931 and out-of-pocket costs of $1,225,793, for a total of $8,191,724. Defs'. Memo. p. 25. Second, defendants point to the testimony of Michael Quattromani, who, they allege, testified at trial that the total damages calculation, excluding interest, totaled $8,191,724 5/17/05 Tr. 33. Finally, defendants rely on a portion of plaintiff's counsel's closing argument which summarized the amount of damages sought. In this section of his closing argument, plaintiff's counsel stated:

> 6.9 million is the papermaking damages from
> Exhibit 108. ... The $6.965 million, so its
> excluding the interest question ... Then for
> out-of-pockets, 1.225 million that I've
> identified for what will be out-of-pockets.
> The 1.5 for the fees for the treated water
> that was never provided. 9.6, approximately
> 9.7 million dollars.

_____

[19] In a later section of their memorandum, defendants duplicatively argue that plaintiff failed to prove damages with reasonable certainty. Therefore, the Court will incorporate that argument here and will not re-address it under a separate heading.

5/22/05 Tr. p. 65-66.  Defendants argue that the reference to the $1.5 million represents a "double-counted amount that Attorney Goldberg mistakenly included in his remarks."  Defs'. Memo. p. 26.

The Court first takes issue with defendants' argument that only two pieces of evidence, the summary and the testimony of Quattromani, were offered to support the damages claim.  A review of the transcript indicates that the 2005 damages trial lasted approximately ten days.  The evidence presented over this ten-day period included testimony from six plaintiff witnesses (Dave Dyer, Bruce Poole, Paul Schaffman, Dr. Roger May, Kris Gachassin, and Mike Quattromani).  It is surprising that defendants now argue that, over this ten-day period, only two pieces of evidence were introduced regarding the amount of damages.

The defendants allege that the Summary of damages presented to the jury evidenced damages in the total amount of $8,191,724. First, the Summary of damages is exactly that, a summary.  This Summary was presented to assist the jury in determining where the damages came from and in what amounts.  It was never intended to be the only damages considered by the jury, and it was not the only evidence presented.  Oral testimony was provided to support significant additional damages.  For example, Quattromani testified that the figures used in Exhibit 108A were conservative.  If the jury determined that the less conservative figures should be used in calculating damages, it is evident that

the damages award would be higher than the numbers outlined in Exhibit 108A.

More importantly, however, defendants' argument mischaracterizes the record.  During the trial, Exhibit 108A was modified, without objection.[20]  This modified exhibit included the additional figure of $1.5 million.  5/11/05 Tr. 15.  The additional $1.5 million reflected the minimum amount of historical damages incurred for the service fees paid by plaintiff under the Supply Agreement.  Id.  If one were to total all the figures listed on modified Exhibit 108A, the result is $9,691,724 -- not the $8,191,724 claimed by defendants.[21]

Next, defendant claims that Quattromani testified that "plaintiff's total damages calculation, exclusive of interest, was $8,191,724."  Defs'. Memo. p. 25 (citing Ex. 12, 5/17/05 Tr.

---

[20] Q: You had [indicated] earlier that to date Rand-Whitney has paid the town a million and a half dollars in the service fees for the water supply agreement?

A:    Yes.

Q:    During any of those ten years, did Rand-Whitney receive treated water, as defined in Schedule 1.1 from the town?

A:    No we have not.

MR. GOLDBERG:  Just note here.  I'm going to write (inaudible) treated water.  Date, 1,5000,00

THE COURT:    He's offering 108-A, as modified during the course of the examination of Mr. Quattromani.

MR. WADE:     Yeah, no objection, I guess.

[21]  This figure is only $308,276 dollars less than the actual jury verdict of $10 million.

41

p. 33). This was not Quattromani's testimony. On page 33 of the transcript, the following dialogue ensued:

> Q: Okay. Now, as I understand it, some arithmetic was done ...
>
> A: I believe we transposed some numbers from -- from some other exhibits.
>
> Q: Yes. All three exhibits were calculations done by you --
>
> A: Yes.
>
> Q: - - of your estimate of what damages are, in this case?
>
> A: That's correct.
>
> Q: And have you done the calculation from - - the total calculation 12,322,845 to 8,191,724? Have you done that?
>
> A: I'm sorry, Mr. Wade, your question is, please?
>
> Q: Yes. Have you done the arithmetic calculation from 12,322,845 to 8,191,724, have you done that?
>
> A: The arithmetic subtraction of those two numbers?

5/17/05 Tr. 33. Nowhere on this page does Quattromani testify that the total damages sought by plaintiff were $8,191,724. Quattromani did testify, without objection, that the plaintiff would be billed and pay approximately $150,000 per year for the next 40 years in future fees. This figure totals approximately $6 million. 5/11/05 Tr. 15. Additionally, Quattromani stated that certain additional costs were not calculated into the figures found in Exhibit 108A. Id. at 35, 39.

In additional support of its damage claims, plaintiff offered substantial evidence to establish facts such as the amount of water the Mill used daily, TDS levels in the water

daily and monthly; the impact of the corrosive water on the mill and papermaking process, and the costs plaintiff incurred attempting to lessen its harm.  See Ex. 43, 36, 49-51, 63, 69, 71-73, 93A-D, 94, 94A, 94B, 96, 97, 100, 100A, 101, 102, 103, 104, 106, 107A, 108A, 108A-1, 108B, 108C, 108D, 109, 119, 120A, 120B and 121.  In fact, Exhibit 109 is a three-inch binder containing invoices, financial records, and other business records to support plaintiff's damage claim.  Likewise, Exhibit 107 summarized the underlying data used in the Transition Impact Analysis.

Plaintiff's counsel then, in closing arguments, argued for these damages.  Defendants assert that the claim for $1.5 million was "a double-counted amount that Attorney Goldberg mistakenly included in his remarks."  Defs'. Memo. p. 26.  As discussed above, this assertion is clearly incorrect.  The Court finds that plaintiff's counsel argued that, at a minimum, the jury should award damages in the amount listed on the modified summary -- "[e]ven if just limit yourself to that, even if you don't increase it for the various reasons I've identified ...."  5/22/05 Tr. p. 65-66.

In sum, the Court finds that the evidence demonstrated that, 1) conservative calculations were used to arrive at the modified summary total of $9,691,724; 2) there would be approximately $6 million expended on future services fees; and 3) certain losses were excluded from the calculation.  Based on this evidence, there was ample basis for a reasonable jury to find damages in

the amount of $10 million.  No injustice flows from this award.
Thus, defendants' motion for a new trial on damages or,
alternatively, remittitur, based on the sufficiency of the
evidence is denied.

### C.   __Objections to the Underlying Evidence__

Defendants argue that the jury verdict was based on
plaintiff's misleading manipulation of the raw production data,
which "conceal[ed] the fact that there was little or no
diminution of linerboard production due to the Town's water."
Defs'. Memo. p. 28.  Defendants claim that plaintiff manipulated
the evidence several ways -- 1) by grossly exaggerating
historical damages by "cherry-picking" production figures from
selected months, Id. at 29; 2) by exaggerating the 'Reproduced
Reduction Factor' of 2.6% which did not take into account that
"the trend in the difference in production on town water and pond
water was (a) leveling off and (b) actually improving on town
water over that on pond water," Id. at 32, 34; 3) by using
calculations, regarding increased chemical use and chemical cull,
that were also the result of "selected averages," Id. at 33;
4) by failing to show that "profit per ton" calculations
evidenced "actual diminution in sales attributable to any
diminution in production attributable to town water," Id.; and
5) by failing to account for continuing or emerging trends, Id.
at 35, 37.  Based on the above, defendants argue that Connecticut

law supports the defendants' claim for new trial or remittitur. Id. at 38-39.

### 1.   **Waiver of Sufficiency Issues**

While some sufficiency of evidence issues were raised in defendants' directed verdict motion, those issues are not presented here.  Instead, defendants raise several new challenges to the underlying evidence offered by plaintiff in support of damages.  Defendants appear to claim that these issues are properly preserved because they were previously presented, albeit without such specificity.  The Court disagrees.  Although the issues raised by defendants in the motion for directed verdict and this motion challenge the sufficiency of the damages evidence, the bases for the challenges are quite distinct. Defendants' failure to preserve the issues is fatal to the consideration of the arguments at this time.

Procedurally, "[a] motion for j.n.o.v. is technically a renewal of a motion for a directed verdict.... Thus, Federal Rule of Civil Procedure 50(b) generally proscribes judgment n.o.v. on any ground not specifically raised in an earlier motion for a directed verdict at the close of all the evidence." Doctor's Assocs., Inc. v. Weible, 92 F.3d 108, 112 (2d Cir. 1996) (citations omitted).

The Federal Rules of Civil Procedure "do[] not define how specific" the motion for directed verdict must be.  Fed. R. Civ. P. 50 Advisory Committee Note (1991).  However, moving parties

should specifically articulate the ground on which judgment as a matter of law is sought "to give the other party an opportunity to cure the defects in proof that might otherwise preclude him from taking the case to the jury." Id. "Accordingly, the JMOL motion must at least identify the specific element that the defendant contends is insufficiently supported." Galdieri-Ambrosini v. Nat'l. Realty & Dev. Corp., 136 F.3d 276, 286 (2d Cir. 1998). "[I]f an issue is not raised in a previous motion for a directed verdict, a Rule 50(b) motion should not be granted unless it is 'required to prevent manifest injustice.'" Cruz v. Local Union No. 3 of Intern. Broth. of Elec. Workers, 34 F.3d 1148, 1155 (2d Cir. 1994) (citation omitted).

Here, in the directed verdict motion made at the close of evidence, defendants argued, with respect to the sufficiency of evidence, that:

> Your Honor, we do move for a directed verdict on all of the plaintiff's damages as not having been proven with the necessary specificity. They are based on averages, when they had actuals. They are based on estimates, when they did not have records ... Their entire damage claim is highly speculative, and overly theoretical with respect to the past, with respect to the future ... There's nothing to say that they've established a right to 20 years of damages, and that it's gonna be 90 days. Nothing to prove that it's gonna be 90 days of Town water.... There's no proof of that, and finally, who's to say that this production factor is the same, because what they've done with their production factor, Your Honor, is a very ingenious trick. The production loss factor averages from 1995 through 2004, but if you look at the actual numbers they're achieving right now, there's no difference between pond and Town, so why in the world establish a production loss factor which is then carried into the future, which is based on what happened in '96, not what happened in 2004 ....

5/19/05 Tr. 101-103  In the directed verdict motion, defendants challenged plaintiff's damages due to their "speculative" nature and the fact that they were based on "averages" and not "records."  However, the grounds which defendants now argue in support of their insufficient evidence claims are different. Defendants now challenge the damages award on theories well beyond their previous "speculative" argument.  For example, in the directed verdict motion, defendants did not challenge the time periods used by plaintiff's counsel in formulating past and future losses, did not challenge the chemical costs, did not challenge the profit per ton calculation, and did not challenge the "emerging trend."  Additionally, in their motion for directed verdict, defendants never challenged the evidence introduced by plaintiff as being flawed.[22]

Thus, the Court finds that defendants failed to adequately preserve their objection with respect to their claims that plaintiff: 1) grossly exaggerated historical damages by "cherry-picking" production figures from selected months; 2) grossly exaggerated the 'Reproduced Reduction Factor' of 2.6% by not taking into account that "the trend in the difference in production on town water and pond water was (a) leveling off and (b) actually improving on town water over that on pond water";

---

[22]  The Court also notes that the defendants did not object to, and even stipulated to, most of the evidence introduced during the trial.  Absent such objection, defendants have waived their right to challenge the exhibits in post-trial motions. Sansone v. Bechtel, 180 Conn. 96, 99-100 (Conn. 1980) (failure to object to the evidence constitutes waiver).

3) used calculations, regarding increased chemical use and chemical cull, that were also the result of "selected averages"; 4) failed to show that "profit per ton" calculations evidenced "actual diminution in sales attributable to any diminution in production attributable to town water"; and 5) failed to account for continuing or emerging trends.

Defendants' failure to raise these arguments in their motion for directed verdict constitutes a waiver of their right to raise these issues in a Rule 50(b) motion.

### 2. Defendants Presented These Arguments to the Jury

Even if the allegations made by the defendants regarding the sufficiency of the raw data evidence, as outlined above, were properly preserved, these claims are nothing more than a regurgitation of the arguments made to the jury through cross-examination of witnesses and during closing arguments. Defendants clearly challenged the allegedly speculative nature of plaintiff's evidence throughout the trial. For example, defense counsel argued in closing:

> Now the damage claim itself, that the --
> Rand-Whitney, the plaintiff says they've
> proven by a preponderance of the evidence.
> According to Mr. Schaffman, excuse me, Mr.
> Quattromani, who along with Mr. Schaffman
> devised the concept, 108-A, this is, as he
> put it, 'A methodology backed up by
> assumption, supported by estimates, and
> that's the proof by a preponderance of the
> evidence that they offer you. ...[T]hey could
> have kept the records. ... We're in Court.
> We don't need - - You don't need, as jurors,
> you don't need to rely on estimates. Why?
> This is a big company. They've got

> computers.  They hit a button and zap, out
> comes the records on a spreadsheet, but no,
> what they ask you to do is rely upon their
> calculation, their estimates when they
> could've had the records to back it up.

5/23/05 Tr. 111-18.  Other examples of defense counsel's specific

challenges include: 1) the reasonable certainty standard, Id. at

98-99; 2) the calculation of historical damages, Id. at 118;  3)

the use of the 2.6 percent rate, Id.; and 4) the increased

chemical use factor and increased chemical cull factor, Id. at

135.  Defense counsel's jury argument regarding the sufficiency

of the evidence went on at length, was not limited by the Court,

and incorporated the issues raised above.

When deciding remittitur motions in diversity cases, federal

courts apply federal procedural standards and state substantive

law.  Imbrogno v. Chamberlin, 89 F.3d 87, 90 (2d Cir.1996)

(internal citations omitted).  The court must consider the motion

for a new trial or remittitur under the procedural standards of

Rule 59 of the Federal Rules of Civil Procedure, but must look to

state substantive law to determine if the verdict was excessive.

Id.  "A trial judge does not sit and vote as a juror; his or her

personal reaction to a jury's verdict is not a substitute for

legal authority to alter that body's decision." Id. at 88.

"Under Connecticut law, a court may grant remittitur only when

the jury verdict is excessive as a matter of law."  Id. at 90

(internal citations and quotation marks omitted).

"Litigants have a constitutional right to have factual

issues resolved by the jury....  This right embraces the

determination of damages when there is room for a reasonable difference of opinion among fair-minded persons as to the amount that should be awarded....  The amount of a damage award is a matter peculiarly within the province of the trier of fact, in this case, the jury....  The size of the verdict alone does not determine whether it is excessive.  The only practical test to apply to [a] verdict is whether the award falls somewhere within the necessarily uncertain limits of just damages or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury was influenced by partiality, prejudice, mistake, or corruption." Ham v. Greene, 248 Conn. 508, 536, 729 A.2d 740 (1999) (quoting Mather v. Griffin Hosp., 207 Conn. 125, 138-39, 540 A.2d 666 (1988) ("The jury had the right to accept whatever portion of the evidence it chose and consider it in its calculations")).

The fact that the jury rejected some, if not all, of the arguments presented by defendants does not equate with defendants' argument that the evidence was insufficient to support the verdict.  In light of the evidence presented at trial, much of it without objection, defendants have not proved that the jury award in this case "so shocks the sense of justice" that a new trial or remittitur is warranted.  Therefore, defendants' motion for new trial or remittitur is denied.

## VI.  Conclusion

Based on the above, the Court finds that the defendants have failed to carry their burden of demonstrating their entitlement

to a judgment as a matter of law, a new trial, or a remittitur. Thus, defendants' renewed motion for a judgment as a matter of law, motion for new trial, and motion for remittitur [Doc. #545] are **denied.**

SO ORDERED at Bridgeport, Connecticut this 19th day of July, 2007.

_____/s/_____
HOLLY B. FITZSIMMONS
UNITED STATES MAGISTRATE JUDGE